Joey BREWER, Petitioner,

v.

Clifford MARSHALL, Sheriff, Norfolk County, Respondent.

Civil Action No. 93–12635–PBS.

United States District Court, D. Massachusetts.

Aug. 13, 1996.

William A. Hahn, Boston, MA, for Petitioner.

Neil S. Tassel, Ellyn H. Lazar, Attorney General's Office, Boston, MA, Arthur L. Isberg, Norfolk County Sheriff's Dept., Dedham, MA, for Respondent.

### MEMORANDUM AND ORDER

SARIS, District Judge.

#### I. Introduction

Petitioner, Joey Brewer, an African–American former police officer, petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that his conviction in the Massachusetts Superior Court for raping a fifteen year-old Hispanic girl was unconstitutionally obtained in violation of his Fourteenth Amendment rights to equal protection and due process of law.

First, he contends that the prosecution impermissibly exercised peremptory challenges on the basis of race during jury selection when it challenged four out of six African–American venirepersons in the first round of challenges. Second, he claims that the prosecution failed timely to divulge material exculpatory evidence to the defense—the name of the alleged victim's boyfriend with whom she had sexual intercourse near the time of the rape. The alleged victim testified about this sexual intercourse to explain away the defense evidence that semen samples taken from the rape kit did not match Brewer. However, Brewer contends that the identity of the boyfriend was critical exculpatory evidence because testing of the boyfriend *after* trial also ruled out the boyfriend as the source of the semen. This supported Petitioner's position that he came upon the alleged victim and her father having sex in the car, and he simply took her home without raping her.

This case was referred to Magistrate Judge Marianne Bowler, who issued a report and recommendation dated April 2, 1996, dismissing Brewer's petition, to which Brewer has filed objections. After hearing, this Court adopts in part and rejects in part the Magistrate Judge's report. Because the Court concludes that Petitioner had established a prima facie case of racial discrimination in the government's use of peremptory challenges, the Court *ORDERS* an evidentiary hearing.

#### II. Background

The Court states the factual background in the light most favorable to the verdict. *Stewart v. Coalter,* 48 F.3d 610, 611 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995).

#### A. The Rape

Brewer, an African–American, was a Boston police officer. While on duty early in the

morning of October 22, 1988, Brewer came upon Anthony S.[1] and his then fifteen-year old daughter, B., in a parked car in Franklin Park. B. and her father are both Hispanic. Brewer ordered Anthony to leave the area, and he then placed B. in his cruiser. He took her to another location, raped her, and then drove her home.

Upon arriving there, B. immediately told her parents about the rape, and the victim and her father went to the police to report it. B. was taken to Children's Hospital for an examination and interview at which time various fluid samples were taken via a rape kit. B. then directed the police to the scene of the rape where they found half of her class schedule on the ground. The police also checked their communications logs and discovered that Brewer had failed to respond to four calls during the time period in which the victim claimed to have been raped. Brewer made out a field interrogation and observation report at the scene but apparently never filed it. In addition, he neither arrested B.'s father nor did he seek medical attention for B. Brewer was arrested later that morning and charged with the rape of a child by force and kidnapping.

B. told police, and later testified at trial, that Brewer penetrated her twice, once with a condom and once without. Samples from the rape kit were tested, which revealed the presence of semen inside B.'s vagina, although there was no evidence that Brewer ejaculated.[2] On December 14, 1989, the government reported that test results were inconclusive as to whether Brewer was the source of the semen. Petitioner contends that when initial tests failed to confirm that he was the semen "donor" the government ceased further testing, which would have ruled him out as the source.

Brewer's story significantly differed from the Commonwealth's version. Petitioner

contends that on the night of the incident he came upon the victim, naked in the rear of a car, with a half-clothed man exiting the back seat who later proved to be her father. B. had been drinking alcohol and smoking marijuana with her father and a friend. He argues that B.'s father was having intercourse with his daughter when he discovered them, and that her father was the "donor" of the semen discovered in her vagina. Any delay in bringing her home was due to the fact that both the father and B. supplied the officer with false names, and it took some time to discover their true address.

### B. Jury Impanelment

On January 11, 1989, Brewer was indicted for kidnapping, M.G.L. c. 265, § 26 and rape of a child under 16 by force, M.G.L. c. 265, § 22A. The latter charge is punishable by life imprisonment. Jury impanelment began on Friday, December 15, 1989, and continued until Monday, December 18, 1989. In addition to a general voir dire, the court conducted an individual voir dire. At voir dire, the trial judge *sua sponte* asked potential jurors whether they were biased either for or against African–Americans or Hispanics.[3] The transcript of the individual voir dire revealed no additional information about the prospective jurors except their denial of any bias. Once this voir dire was completed and the remaining venirepersons declared indifferent, the parties began to exercise peremptory challenges.

The trial judge impanelled as follows. Fourteen potential jurors were seated in the jury box. Peremptories were exercised in rounds. The government exercised peremptories until content with those jurors sitting in the box, including replacements for those previously struck. Petitioner then similarly exercised his challenges on the re-

---

1. The Court is deleting identifying information about the alleged victim of the rape, then a juvenile.

2. Clothes surrendered by Petitioner were tested and revealed the presence of semen on his undershorts; however, this evidence was not introduced at trial.

3. At the time of Brewer's trial, Massachusetts law required the trial judge, at defendant's re-

quest, to conduct a voir dire to determine racial bias in charges involving inter-racial sexual offenses. *See Commonwealth v. Sanders,* 383 Mass. 637, 640–41, 421 N.E.2d 436, 438–39 (1981), *rev'd, Commonwealth v. Ramirez,* 407 Mass. 553, 555 N.E.2d 208 (1990). Brewer had not requested voir dire prior to trial, but acceded to the trial judge's suggestion once she raised the issue.

maining venirepersons and their replacements until he was content or had exhausted his challenges. In this fashion, both parties continued until content or all challenges were expended. *See* 30A Kent B. Smith, *Massachusetts Practice: Criminal Practice and Procedure* § 1720 (1983); Sup. Ct.Rule 6.

Brewer and the government were allowed an initial number of 14 challenges each, which the trial judge supplemented with three additional challenges when three jurors seated on the first day of impanelment were excused on the second day for cause. *See* Mass.R.Crim.P. 20(c) (allowing 12 challenges per side in crimes punishable by life imprisonment plus additional challenges for each additional juror impanelled).

In the first round, the government excused six jurors who were replaced from the venire. Two of the replacement jurors were excused and replaced. Before declaring itself content, the government struck and replaced an additional juror. Altogether, the government exercised a total of nine strikes in the first round. In doing so, the government excused four of the six African–Americans in the jury box.[4]

At this point, defense counsel (Mr. McGee) objected. The following colloquy among the prosecutor (Mr. Pomarole), Mr. McGee and the Court ensued:

Mr. McGee: At the outset, I'd like to object on the record to Mr. Pomarole having taken off four black people from the jury. We had a fair representation racially of six and now we're down to two.

The Court: Mr. Pomarole—

Mr. Pomarole: Your Honor—

The Court: —I'm going to ask you to give us the reasons for your challenges.

Mr. Pomarole: Your Honor, I'd like to also say at the outset—your Honor, I believe I've challenged white people as well as black people without respect to gender.

Mr. McGee: He hasn't responded, Judge.

The Court: I know he hasn't yet, sir.

Mr. Pomarole: I'd have to go get my notes, your Honor, with respect to the people that I've challenged.

The Court: At this point, Mr. McGee, I'm not going to require Mr. Pomarole to give his reasons. But I put you on notice, Mr. Pomarole, that, should this issue arise again, sir, I am going to ask you to justify your challenge. Mr. McGee, in the future, you should raise that, sir, at the time the challenge is made.

Mr. McGee: Well, I didn't see the pattern emerge until it was completed.

The Court: Let's move to Mr. McGee's challenges at this time.

Tr. 12/15/89 at 123–24. Brewer then excused 14 potential jurors, one of whom was African–American. The jury pool was then exhausted.

In the second round conducted the following work day, Monday, December 18, the Court again conducted a general and individual voir dire with a fresh jury pool. The government excused an additional two jurors, one of whom also was African–American. Brewer again objected as follows:

Mr. McGee: Your Honor, may the record reflect that the Commonwealth has taken off yet another black juror who has been replaced by a white juror.

. . . .

The Court: Would you explain your reasons for that, Mr. Pomarole?

Mr. Pomarole: Your Honor, I believe the reason is that the lady has two children: one is 25 and one is 27. That's the approximate age of this defendant. And I just felt that if anybody was going to feel any empathy for this man and not be totally objective, it would be somebody who had a child approximately that age. And that was my reason.

Tr. 12/18/89 at 106. The prosecutor then raised the fact that Brewer also had struck an African–American from the panel in the first round. The prosecutor was not asked to give reasons for striking the other four African–American jurors the day before.

---

4. There was some dispute as to whether one of the six jurors was Hispanic or African–American. Because he was later excused by the defense, and the trial judge apparently found that he was African–American, this Court will consider him to have been African–American.

Curtailing further argument, and without making specific findings as to whether the reason given was credible, the trial judge directed the Commonwealth to proceed with its challenges.

Eventually, the government declared itself content and Brewer exhausted his peremptories. In total, the government exercised eleven peremptories, five of which were used to excuse African–Americans from the jury. Brewer used one of his seventeen peremptories to excuse one African–American from the panel. Of the seven African–Americans who had been seated in the box, one African–American remained on the panel. At the end of the trial, he was selected as an alternate and did not deliberate.

While no statistics are presented as to the racial composition of the venire, the Court is able to determine with reasonable certainty that a total of 45 persons passed through the jury box of whom seven were African–Americans.[5]

C.  Non–Disclosure

On December 14, 1988, one day before impanelment, the prosecutor informed Brewer and the trial court that he would not introduce any evidence regarding the scientific testing of semen samples during the Commonwealth's case-in-chief because of the inconclusiveness of the test results. However, if Brewer were permitted to introduce evidence about the semen samples that ruled him out as the donor, the Commonwealth stated it would recall B. on rebuttal to ask whether she had unprotected sexual intercourse with a boyfriend on or about the time of the rape. Tr. 12/14/89 at 11.

On December 18, 1989, the day the Commonwealth began its case, Brewer twice made an oral motion requesting the name of the alleged victim's boyfriend, apparently in the hopes of developing additional evidence that the alleged victim had intercourse with her boyfriend that night, thus providing a motive for lying.[6] The trial judge refused the request for the boyfriend's name on the ground that any testimony concerning sexual intercourse was barred by the Massachusetts' Rape Shield Act, M.G.L. c. 233, § 21B. That statute makes inadmissible "evidence of specific instances of a victim's sexual conduct" subject to certain exceptions including evidence suggesting the victim's bias or motive to lie and requires the proponent of the evidence to make a written motion to be followed by an in camera hearing and an offer of proof. Id.; Commonwealth v. Joyce, 382 Mass. 222, 231, 415 N.E.2d 181 (1981).[7] The issue of the admissibility of the semen testing was deferred to the close of the Commonwealth's case.

Petitioner filed a written motion pursuant to M.G.L. c. 233, § 21B on December 21, 1989, seeking to introduce evidence regarding the semen samples but did not include in the written motion a specific request for the name of the victim's boyfriend. He did not press the request for the boyfriend's identity orally either. After a hearing on December 22, 1989, after the close of the Commonwealth's case, the trial judge ruled that Brewer could present evidence of blood and semen testing on the issue of the victim's bias and motive to lie. The defendant's theory of the case had shifted from the initial argument that sexual intercourse with the

5. The Court arrives at this number by adding the total number of jurors impanelled (14), the total number of peremptories exercised by both sides (28), and the three jurors who were excused at the beginning of the second day of deliberations. The Court knows that only seven of these persons were African–American by adding the number of African–Americans struck by the government (5), the number struck by Brewer (1), and the one seated juror who was African–American. It is reasonable to conclude that if additional African–Americans passed through the jury box and were challenged by either side, one of the parties would have brought that fact to the attention of the trial court, or to this Court on habeas review.

6. Defendant did not request at the point, nor did he ever request, that the victim's father provide a blood sample for testing.

7. M.G.L. c. 233, § 21B provides in pertinent part: Evidence of specific instances of a victim's sexual conduct ... shall not be admissible except ... evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim; provided, however that such evidence shall be admissible only after an in camera hearing on a written motion for admission of same and an offer of proof.

boyfriend gave the alleged victim motive to lie. Instead, Brewer's position was that if B. were having sexual intercourse with her father, she would have a strong incentive to fabricate a story to prevent further embarrassment or prosecution of her father. Brewer contended that evidence of blood and semen testing that would rule him out as the semen donor would lead the jury to believe it more likely that her father was the source of the semen samples taken from the alleged victim on the night of the incident. The trial judge concurred.

Accordingly, as part of the defense case, Brewer presented evidence through an expert that blood and saliva testing established that he was not the source of the semen samples. Petitioner also took the stand and testified that when he looked into the back of the car he saw the alleged victim naked and a man (who turned out to be her father) with his pants down. As promised, the government recalled B. as a rebuttal witness, who testified that she had unprotected sexual intercourse with her boyfriend, Earl Lopes, during the week of the alleged rape.

This testimony, which tended to explain the presence of the semen samples, was given on the last day of the trial. Brewer previously was unaware of the boyfriend's identity. Although he protested this late disclosure at trial and moved for a mistrial because of the delayed disclosure,[8] he did not request a continuance so that he could locate and interview the boyfriend. During closing arguments, Brewer pointed to the fact that the boyfriend did not testify at trial in an attempt to impeach B.'s testimony. Brewer's counsel also sought to persuade the jury that the alleged victim's father had sexual intercourse with the alleged victim on the night of the alleged rape.

On December 29, 1990, after more than two days of deliberations, the jury convicted Brewer on both counts, and the trial judge sentenced him to 9–12 years on the rape charge and 3–5 years on the kidnapping charge, to be served concurrently.

### D.  Post–Trial Proceedings

After trial, Brewer located Lopes through a private investigator, and he agreed to provide a blood sample for testing. The test results tended to show that Lopes also was not the source of the semen samples taken from the victim on the night of the rape.

Armed with this "new evidence," on December 23, 1991, Brewer filed a motion for a new trial. After a hearing, the trial judge denied the request holding that "the blood test of the victim's boyfriend does not constitute any relevant newly discovered evidence which supports the allowance of a new trial." *Commonwealth v. Brewer*, No. 075713, slip op. at 3 (Suffolk Sup.Ct. July 23, 1992) [hereinafter "New Trial Order"]. According to the trial judge, Brewer failed to exercise due diligence in locating this new evidence because Petitioner never "formally" requested the boyfriend's identity, as was consistent with his theory that the victim's father was the source of the semen. Even if the new evidence had available at trial through due diligence, the trial judge also held that it was not material exculpatory evidence, reasoning that the issue at trial was the identity of the rapist rather than the semen donor. Also in her denial of the new trial motion, the trial judge found that "there was no showing that the Commonwealth was excluding blacks solely by reason of their group membership" during jury selection. She thus refused a second time to entertain Brewer's *Batson* challenge. *Id.* at 5.

In a terse, one and one-half page opinion, the Massachusetts Appeals Court affirmed Brewer's conviction on June 21, 1993. The opinion simply states "[s]ubstantially for those reasons set out in the Commonwealth's brief and the trial judge's memorandum of decision in denying the defendant's motion for a new trial[,] we conclude that there is no basis for disturbing the defendant's convic-

---

**8.** During a bench conference after B.'s rebuttal testimony, the following colloquy ensued:

Mr. McGee [Brewer's counsel]: When my brother started making noises about [B.'s] boyfriend, I specifically asked him the name of this guy. I'm in the position now where I'm shortstopped on credibility. I don't know who this guy is. At least I could have had an opportunity to interview him.

The Court: Sir, I'm not going to revisit that.

Tr. 12/27/90 at 44.

tions." *Commonwealth v. Brewer*, No. 91–P–1062, slip op. at 2, 615 N.E.2d 952 (Mass.App. Ct. June 21, 1993). The Supreme Judicial Court denied Brewer's Application for Leave to Obtain Further Appellate Review ("ALOFAR") on June 30, 1993.

The present petition followed and was referred to Magistrate Judge Bowler for decision. After two unexhausted claims were deleted from Brewer's petition, Magistrate Judge Bowler considered the merits of the remaining claims and issued a report and recommendation dismissing Brewer's petition. In reasoning explained more fully below, she held that: (1) the trial judge had not committed plain error by failing to find that Brewer had made a prima facie case of racial discrimination in jury selection; and (2) that Brewer's failure to request a continuance during trial eliminated any prejudice resulting from the Commonwealth's delayed disclosure of the identity of the victim's boyfriend. Brewer timely filed objections.

### III. *Discussion*

#### A. *Batson Challenges*

##### 1. *The Framework*

Brewer asserts that Respondent violated his right to equal protection of the laws by exercising race-based peremptory challenges in selecting the jury which convicted him. In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on the account of their race . . . ." *Id.* at 89, 106 S.Ct. at 1719. There, the prosecutor used his peremptory challenges to strike all four African–Americans on the venire, resulting in a petit jury comprising only white persons in the trial of an African–American defendant. Remanding for further factfinding, the Court held that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96, 106 S.Ct. at 1723. *Batson* permits defendants to assert both their right "to be tried by a jury whose members are selected by nondiscriminatory criteria," *Powers v. Ohio*, 499 U.S. 400, 404, 111 S.Ct. 1364, 1367, 113 L.Ed.2d 411 (1991), and the rights of the potential jurors to be free from discrimination. *Id.* at 415, 111 S.Ct. at 1373. *Batson* thus is concerned with the integrity of the judicial process itself rather than the guilt or innocence of a particular defendant.

In *Batson* and its progeny, the Court outlined a three-step procedure for determining whether a prosecutor (or other party) has exercised peremptory challenges on the basis of race:

> [O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful discrimination.

*Purkett v. Elem*, — U.S. —, — – —, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995) (citing *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991)); *Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723–1724.

The first step of this inquiry, in turn, requires the defendant to make a three-part showing. Recent First Circuit caselaw enumerates and clarifies the necessary elements of a prima facie case:

> The combination of factors needed to establish a prima facie case are limned in *Chakouian v. Moran*, 975 F.2d 931, 933 (1st Cir.1992). Initially, the defendant must demonstrate that the prosecution's challenge was directed at a member of a cognizable racial group. *See Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23[;] *Chakouian*, 975 F.2d at 933. Next, the defendant must show that the challenge was peremptory rather than for cause, thus bringing into play the Supreme Court's admonition that "peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722–23[.] Finally, the defendant must show circumstances suffi-

cient, when combined with the two antecedent facts, to raise an inference that the prosecutor struck the venireperson on account of race. *See id.* While the prima facie case requirement is not onerous, neither can it be taken for granted.

*United States v. Bergodere,* 40 F.3d 512, 515–16 (1st Cir.1994) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995).

It is clear as an initial matter that Brewer satisfied the first two elements of a prima facie case in that: (1) the Commonwealth struck jurors who were members of a protected group; and (2) the challenges were peremptory rather than for cause. This case therefore turns on whether Brewer showed circumstances sufficient to raise an inference of purposeful racial discrimination in the prosecutor's exercise of a "pattern" of strikes against African–American venirepersons.

### 2. State Court Findings and Standard of Review

Brewer contends that he met this last requirement when he objected after the Commonwealth used four of the nine peremptories it exercised in the first round to excuse four of the six African–American venirepersons then sitting in the jury box. He argues that the trial judge's refusal to require reasons to be supplied for the exercise of these peremptories was constitutional error. Furthermore, he contends that the reason supplied by the prosecutor for his fifth peremptory exercised against an African–American venireperson was pretextual and should not have been accepted by the trial judge.

The Commonwealth counters that Brewer did not establish a prima facie case at trial and, therefore, the prosecutor was not required to supply answers for the first four challenges. It argues that the trial judge's refusal to request reasons was itself a factual finding of an absence of discrimination to which a presumption of correctness attaches on habeas review. It also maintains that the reason supplied for the fifth challenge at issue was adequate to survive a *Batson* challenge.

Magistrate Judge Bowler agreed with the Commonwealth's position in her report and recommendation. Report at 6–7. She found that the trial judge properly decided that "petitioner failed to meet his initial burden of establishing a prima facie case because petitioner failed to give details as to why the [prosecutor's] challenges were improper." *Id.* at 10. With respect to the prosecutor's challenge to the fifth African–American venireperson, the Magistrate Judge decided that the trial judge had not clearly erred by accepting the government's proffer of a race-neutral reason. *Id.* at 8. Having conducted its own close review of the record, the Court must reject, in part, the Magistrate Judge's recommendation that Brewer failed to establish a *Batson* prima facie case.

The First Circuit has made clear that the question of whether a defendant has established a *Batson* prima facie case is "a mixed question of law and fact" that is "fact-sensitive, and, therefore, should be reviewed under the familiar clear-error standard." *Bergodere,* 40 F.3d at 516. Such deference is warranted because the determination as to whether a case of purposeful discrimination has been made primarily rests on an "evaluation of credibility" made by the trial court. *See Hernandez,* 500 U.S. at 367–68, 111 S.Ct. at 1870–71 ("On federal habeas review of a state conviction, 28 U.S.C. § 2254(d) [28 U.S.C. § 2254(e) as amended] requires the federal courts to accord state-court factual findings a presumption of correctness."); *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21; *Bergodere,* 40 F.3d at 516 (clear error standard of review "is consistent with the Supreme Court's expression of confidence that trial judges, experienced in conducting and supervising voir dire, will likely be able to identify prima facie cases of discrimination").

This highly-deferential standard of review presupposes, however, that a trial judge has made explicit findings on the record to which such deference could be accorded. For this reason, "[a]s a general matter [trial] courts should articulate the bases of their factual findings related to *Batson* challenges...." *United States v. Perez,* 35 F.3d 632, 635 (1st Cir.1994). Where "neither the trial record nor the written opinions of the state trial or appellate courts provide[d] a clear statement

of the factual findings necessary to support the courts' legal conclusion that [the defendant] was not denied equal protection of the law[,]" the Third Circuit held that the trial judge's decisions were subject to plenary review. *Jones v. Ryan,* 987 F.2d 960, 965–66 (3d Cir.1993) (Higginbotham, J.); *see also Montiel v. City of Los Angeles,* 2 F.3d 335, 339 (9th Cir.1993) (holding trial court erred by "summarily overruling, with absolutely no inquiry or discussion" defendant's *Batson* challenge); *cf. United States v. McDowell,* 918 F.2d 1004, 1011–12 (1st Cir.1990) (requiring remand of sentencing where no explicit factual findings made to which clearly erroneous standard of review could be applied).

Here, there were no explicit factual findings made by the trial judge on Petitioner's *Batson* challenge. The trial judge implicitly may have found that Brewer had established a prima facie case when she asked the government to give reasons for its challenges after it challenged four out of six African–American jurors. *See Commonwealth v. Mathews,* 31 Mass.App.Ct. 564, 569, 581 N.E.2d 1304, 1308 (under state law, presumption that judge made implicit finding of prima facie case because she asked prosecutor to explain reasons), *review denied,* 411 Mass. 1105, 586 N.E.2d 10 (1991). She changed course abruptly and inexplicably when the prosecutor stated he would have to refer to his notes to provide a basis for the challenges. She then chastised Brewer's attorney for objecting after all the peremptories had been exercised, while simultaneously warning the prosecutor that any future strikes against African–Americans must be accompanied by a proffer of reasons. On day two, the trial judge implicitly made a finding of a prima facie case when the government challenged a fifth African–American potential juror, and she implicitly made a finding that the stated reason was not pretextual when she allowed the challenge.

Even then, however, she only asked for reasons as to that juror, not as to all five jurors.

This record supports at least three interpretations. One possibility is that the trial judge initially found Petitioner had made a prima facie case but changed her mind, rejecting Brewer's challenge on timeliness grounds.[9] Another possibility is that she was unsure about whether Petitioner had made out a prima facie case, had requested reasons in the interest of caution, but then decided that there was an insufficient showing of a pattern to justify a delay while the prosecutor referred to his notes. A third possibility is that the trial judge eventually made a finding of a prima facie case with the fifth challenge to a minority juror. Because the trial judge failed explicitly to give her reasons for ultimately overruling Brewer's objections, either in the record or the memorandum and order concerning the motion for new trial, this Court may not meaningfully review her decision. The state appeals court order affirming the trial judge is devoid of any discussion of this issue. Due to this ambiguity, this Court follows *Jones* and gives plenary review to determine whether Brewer had established a prima facie case under *Batson.*

### 3. *Brewer's Prima Facie Case*

Brewer asserts that the prosecutor's use of four of his nine peremptories in the first round to strike four of the six African–Americans who then had passed through the jury box was sufficient to establish a prima facie case. Rejecting this claim, both Respondent and the Magistrate Judge relied upon the First Circuit's statement that "[a] defendant who advances a *Batson* argument ordinarily should 'come forward with facts, not just numbers alone.'" *Bergodere,* 40 F.3d at 516 (quoting *United States v. Moore,* 895 F.2d 484, 485 (8th Cir.1990)); *see also United States v. Dawn,* 897 F.2d 1444, 1448 (8th

9. If the trial judge's decision was premised on the conclusion that Petitioner failed to preserve his *Batson* challenge by not objecting in a timely fashion, the record does not support the conclusion. Brewer stated he could not object until after the first round because that was when the pattern emerged. Brewer's decision not to object until after the first round was legitimate given that an objection after a single strike would have been insufficient to establish a "pattern" under *Batson. See Bergodere,* 40 F.3d at 516–17. After the strike of the fifth African–American venireperson, he renewed his objection. No more was required of him to preserve the issue on habeas review.

Cir.) ("[A] defendant who requests a prima facie finding of purposeful discrimination is obligated to develop [some] record, beyond numbers, in support of the asserted violation."), *cert. denied,* 498 U.S. 960, 111 S.Ct. 389, 112 L.Ed.2d 400 (1990).

As the First Circuit indicated, *ordinarily* numbers alone will not be sufficient to establish a prima facie case. For example, in *Bergodere,* the prosecution used one of his peremptories to strike the sole African–American venireperson from the jury. However, no *Batson* prima facie case had been established because the "case involve[d] a single strike, not multiple strikes" and "[t]he government's other peremptories were exercised in an unexceptional manner." 40 F.3d at 516. Importantly, the *Bergodere* Court also held that the voir dire colloquy between the struck venireperson and the trial court "reflect[ed] a legitimate, nondiscriminatory reason why conscientious counsel might desire to exclude the juror from further service." *Id.* at 517 (proffered reason that venireperson who worked for adolescent outreach program might have difficulty being impartial in drug distribution prosecution was legitimately race-neutral); *see also Chakouian,* 975 F.2d at 934 (rejecting, under *de novo* review standard, *Batson* challenge where prosecutor challenged four white jurors and two African–American jurors, there was "no evidence relating to the racial composition of the venire or the empanelled jury," and where there were racially neutral grounds for challenging second African–American juror).

This case is distinguishable from *Bergodere* in several respects. First, it involved multiple strikes against African–American venirepersons rather than a single strike.

Second, although there was an individual voir dire of each potential juror, the Commonwealth has pointed to no specific voir dire that reflects legitimate race-neutral reasons for the first four peremptory challenges to African–American venirepersons. Due to the absence of questions and answers that illuminate the basis for the challenges, there is no record, other than numbers, upon which Petitioner could have made a prima facie case. Of course, this Court is mindful of the First Circuit's admonition in *Bergodere* that numbers alone ordinarily are insufficient but also recognizes the Supreme Court's holding in *Batson* that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723.[10]

Several courts have held that a pattern of strikes against African–American venirepersons may demonstrate a statistical disparity sufficient to establish a prima facie case. Courts have used various yardsticks to measure whether a statistical disparity has been demonstrated, including: (1) examining the number of strikes used against a protected group as a percentage of the total number of strikes exercised by the strike's proponent; (2) the number of strikes used against a protected group compared with the number of that protected group in the venire; and (3) the number of strikes exercised against a protected group with the number of members of that group that remained on the jury. *See* Stephen R. DiPrima, Note, *Selecting a Jury in Federal Criminal Trials After Batson and McCollum,* 95 Colum.L.Rev. 888, 907–909 (1995) (surveying cases and different statistical methods of proving *Batson* prima facie case).

---

**10.** For this reason, the Court summarily rejects Respondent's claim that a holding that numbers alone are sufficient to establish a prima facie case would be a "new rule" under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Batson,* which indicated that a "pattern" of strikes against minority venirepersons could establish a prima facie case, was decided in 1986. Brewer's conviction came in 1990. Furthermore, the SJC was a pioneer in articulating constitutional concerns about race-based peremptory challenges under the Massachusetts Constitution in *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, *cert. denied sub nom.,* *Massachusetts v. Soares,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). In that case, the SJC held that a defendant can make a preliminary showing if "a pattern of conduct has developed whereby several prospective jurors who have been challenged peremptorily are members of a discrete group." *Id.* at 490, 387 N.E.2d at 517 (holding that Commonwealth's exclusion of 92% of African–American venirepersons as compared with 34% of white venirepersons excluded established prima facie case). That a prima facie case could be established by numbers alone thus was clearly established in both federal and state constitutional law prior to Brewer's trial.

For example, courts have found a prima facie case to have been established where a prosecutor's rate of strikes against minority venirepersons represents a significant proportion of the government's total strikes. *See Turner v. Marshall,* 63 F.3d 807, 813 (9th Cir.1995) (finding prima facie case established when prosecution used five of its nine peremptory challenges to strike five out of nine African–Americans from the jury); *Montiel,* 2 F.3d at 339 (holding that prima facie case established when defendant in civil rights case used five of seven peremptory challenges to excuse all three prospective jurors with Spanish surnames and two of three African–Americans); *Jones,* 987 F.2d at 971 (prosecution's use of three of his seven available peremptories to exclude three of four African–American venirepersons available for voir dire establishes prima facie case); *United States v. Ruiz,* 894 F.2d 501, 505–506 (2d Cir.1990) (prosecutor's use of three of its six peremptories to strike three out of four Hispanic venirepersons from jury establishes prima facie case); *United States v. Battle,* 836 F.2d 1084, 1085–86 (8th Cir. 1987) (prima facie case made when prosecutor used five of its six allowable peremptories to strike five of seven African–Americans from jury panel); *see also Commonwealth v. Futch,* 38 Mass.App.Ct. 174, 175, 647 N.E.2d 59, 60 (1995) ("The Commonwealth challenges of four of the six prospective black jurors, constituted a prima facie showing of impropriety."), *review denied,* 420 Mass. 1102, 648 N.E.2d 1286 (1995).

■ Similarly, a prima facie case is established where a prosecutor's rate of strikes against a protected group is significantly disproportionate to the group's population in the venire. *See Turner,* 63 F.3d at 813 (inference of discrimination may be drawn from fact that prosecutor used 56% of its peremptory strikes against African–Americans where only 30% of the venirepersons who appeared before the court for voir dire were African–American); *United States v. Alvarado,* 923 F.2d 253, 255–56 (2d Cir.1991) (*Batson* prima facie case made out where prosecution's challenge rate against minorities was 50 percent (three of six) and minority percentage of the population of the district from

which the venire was drawn was only 29 percent).

■ Finally, the courts have found significant, but not dispositive, the fact that a prosecutor has used his peremptory strikes to excuse some, but not all, minority venirepersons from a jury. "A prosecutor may not avoid the *Batson* obligation to provide race-neutral explanations for what appears to be a statistically significant pattern of racial peremptory challenges simply by forgoing the opportunity to use all of his challenges against minorities." *Alvarado,* 923 F.2d at 256; *see Turner,* 63 F.3d at 813 (fact that prosecutor left four African–Americans on jury did not defeat prima facie case); *Montiel,* 2 F.3d at 340 (even though government declined to strike single remaining minority venireperson from jury, pattern of strikes that excluded five other minority venirepersons established prima facie case); *Alvarado,* 923 F.2d at 255 (striking four out of seven minority jurors establishes prima facie case); *Jones,* 987 F.2d at 971 (presence of one African–American on jury did not prevent finding of prima facie case); *United States v. Johnson,* 873 F.2d 1137, 1139–40 (8th Cir. 1989) (prima facie case where government used two of its six peremptory challenges to exclude two African–American venirepersons although two African–Americans remained on panel), *cert. denied,* 498 U.S. 924, 111 S.Ct. 304, 112 L.Ed.2d 257 (1990); *Battle,* 836 F.2d at 1085–86 (striking five of seven African–Americans sufficient to establish prima facie case); *see also Purkett,* —— U.S. at ——, 115 S.Ct. at 1774 (Stevens & Breyer, J.J., dissenting) (pointing out that majority of justices agreed that use of two-thirds of peremptories to strike African–American veniremen established prima facie case). Thus, the fact that a prosecutor chooses to leave some members of a protected group on a jury is not sufficient to defeat a prima facie case of discrimination where his strikes, considered as a whole, are used disproportionately against members of that group.

■ Applying these factors to the case at bar, the Court holds that Brewer had established a prima facie case under *Batson.* When Brewer first made a *Batson* objection, the prosecutor had exercised nine perempto-

ries, four of which were used to excuse African–American venirepersons. In doing so, he excused four of the six African–American venirepersons then seated on the jury. Thus, he used 44% of his strikes in the first round to excuse 66% of the African–Americans then impanelled.

Moreover, it is likely that the prosecutor struck African–Americans from the jury at a rate higher than that at which they appeared in the venire. Although there are no statistics available as to the exact racial composition of the venire which had been declared indifferent after voir dire, or the racial composition generally in Suffolk County from which the venire was drawn,[11] the Court can estimate that approximately 15% were African–Americans. This figure is derived from the fact that of the total of 45 jurors who passed through the jury box, seven were African–American. Statistically speaking, the racial composition of this relatively large sample of potential jurors should roughly approximate the composition of the venire. If so, the prosecutor's strike rate against African–Americans in the first round (66%) was several times larger than the population of African–Americans in the venire (15%).

Under the several cases cited above, these numbers are amply sufficient to establish a *Batson* prima facie case. The trial judge's first instinct to require reasons after the first four African–Americans were struck was correct and constitutionally mandated. Indeed, such reasons may well have been available, as the prosecutor offered to refer to his notes before the trial judge decided to proceed without a proffer. The trial judge's refusal to proceed further with the *Batson* inquiry was error under either the plenary or clearly erroneous standards of review.

█ Indeed, even if challenges to four out of six minority jurors were not *de jure* sufficient to make out a prima facie case, the trial judge herself implicitly made such a finding

of a prima facie case when she demanded that the prosecutor provide a reason for the fifth minority juror. If prosecutorial challenge of five out of seven African–American veniremen were sufficient to trigger a *Batson* inquiry, it was clearly erroneous not to ask the prosecutor to produce race neutral reasons for *all* five jurors. Once she had realized that a pattern had emerged, the trial judge was required to revisit each of the prior strikes.

This case is therefore left in a somewhat awkward procedural posture. As already stated, ordinary *Batson* procedure dictates that once an opponent of a peremptory establishes a prima facie case, the burden of production shifts to the proponent of the strike. *Purkett,* —— U.S. at —— – ——, 115 S.Ct. at 1770–71; *Bergodere,* 40 F.3d at 515. Here, this course was wrongfully terminated midstream.

The Court is left with two options. It could hold an evidentiary hearing in order to resume the process and enable the Commonwealth to proffer race-neutral reasons with respect to the first four jurors. Alternatively, it could grant Petitioner's writ of habeas corpus and order a new trial.[12]

### 4. Retroactivity of Habeas Corpus Act Amendments

Which path to take depends to some extent upon whether, and to what extent, recent amendments to the Habeas Corpus Act govern this case. On April 24, 1996, President Clinton signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214. Title I of this Act made significant changes to the Habeas Corpus Act, codified in scattered sections of Title 28 of the United States Code. Relevant to present purposes, the Act changes the standard which governs whether

---

**11.** *See generally* D. Dubinsky, *Jury Proportionality: Minority Representation in Massachusetts Juries,* Boston Bar Journal (September/October 1995) (pointing out that Massachusetts does not compile statistics on juror ethnicity).

**12.** In a supplemental brief, the Commonwealth recommends that this Court remand the proceed-

ing to the trial judge to conduct evidentiary hearings. However, remanding this petition to the state trial court to conduct its own evidentiary hearing is not available under 28 U.S.C. §§ 2241, 2254. *See Keller v. Petsock,* 853 F.2d 1122, 1129 (3d Cir.1988).

to hold an evidentiary hearing in a habeas case:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that ... the claim relies on ... a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable or ... a factual predicate that could not have been previously discovered through the exercise of due diligence; and ... *the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.*

110 Stat. at 1219 (amending 28 U.S.C. § 2254) (emphasis added).

There is a serious threshold question about the applicability of this new act to pending proceedings. In a decision holding that the Civil Rights Act of 1991 was not retroactive, the Supreme Court noted the tension between the principles that "a court is to apply the law in effect at the time it renders its decision" and "[r]etroactivity is not favored in the law[.]" *Landgraf v. USI Film Prods.*, 511 U.S. 244, ——, 114 S.Ct. 1483, 1496, 128 L.Ed.2d 229 (1994). As a general rule, "[w]here the congressional intent is clear, it governs." *Id.* (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990)). Where a provision is ambiguous or silent as to its effective date, the court is to apply the principle that statutes burdening private rights (i.e., substantive provisions) are presumed not to be retroactive, *id.* 511 U.S. at ——, 114 S.Ct. at 1499; however, "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." *Id.* at —— – ——, 114 S.Ct. at 1502–1503.

■ As an initial matter, Title I of the Antiterrorism and Effective Death Penalty Act is not explicit as to an effective date. The only explicit reference is found in a new chapter establishing procedures to be followed in death penalty cases, which specifies that "Chapter 154 of title 28, United States Code ... shall apply to cases pending on or after date of enactment of this Act." Section 107(c), 100 Stat. at 1226. Applying the statutory canons *expressio unius est exclusio alterius* and "a court should give effect to every provision of a statute and thus avoid redundancy among different provisions," *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1484, this Court reasonably could conclude that Congress intended only to apply the death penalty provisions retroactively to pending cases. Where Congress explicitly provides for retroactivity in one part of the statute, it may reasonably be inferred that it intended the opposite for the remainder.

Several courts have followed this reasoning in refusing to apply the amendments to cases pending before its enactment. *See Boria v. Keane*, 90 F.3d 36, 37–38 (2d Cir.1996) (per curiam); *Edens v. Hannigan*, 87 F.3d 1109, 1112 n. 1 (10th Cir.1996) (declining to apply amendments to certificate of probable cause to appeal denial of writ issued on October 17, 1994 but still pending on Act's enactment); *Grady v. Artuz*, 931 F.Supp. 1048, 1054 n. 1 (S.D.N.Y.1996) (holding that new provisions do not apply to pending petition except where expressly indicated in capital cases); *United States v. Trevino*, 1996 WL 252570, at *2 n. 1 (N.D.Ill. May 10, 1996) (holding that new provisions not retroactive to pending petition); *but see Leavitt v. Arave*, 927 F.Supp. 394 (D.Idaho 1996) (applying *Landgraf* analysis and holding new amendments to apply to pending petition).

■ This Court need not resolve the difficult question as to whether the new rules governing evidentiary hearings are procedural or substantive, and whether they should be applied retroactively because even if the new limitations are retroactive, an evidentiary hearing would remain available. As the plain language of the statute indicates, evidentiary hearings are not available "[i]f the *applicant* has failed to develop the factual basis of a claim in State court proceedings." 110 Stat. at 1219 (amending and codifying new 28 U.S.C. § 2254(e)(2)) (emphasis added). Once Brewer established a prima facie case under *Batson*, it was incumbent on the Commonwealth to proffer race-neutral reasons for its

strikes. The Commonwealth failed to meet its burden of production, due to no fault of Petitioner (or, for that matter, of the government). Thus, the statute's limitations do not apply, and an evidentiary hearing may be held.[13] It is worth pointing out that neither the government nor the petitioner argued that the new amendments precluded a hearing here.

■ Another new provision of the habeas corpus act potentially at issue here provides that "an application for a writ of habeas corpus [by a state prisoner] shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 110 Stat. at 1219 (adding and codifying new 28 U.S.C. § 2254(d)). Unlike the availability of evidentiary hearings, however, this provision changes the substantive standard of review for granting a petition. The *Landgraf* presumption against retroactivity thus precludes applying this provision to Brewer's petition. *See Boria*, 90 F.3d at 36–38 (declining to apply this provision retroactively). Even if this provision also applies here, however, the Court's earlier holding that the trial judge's decision not to require reasons of the prosecutor was clearly erroneous meets the standard elucidated above. The rules on which this Court relies—that a "pattern" of strikes against minorities can satisfy the prima facie case requirement and that a prosecutor must supply race-neutral reasons once a prima facie case has been made—were both "clearly established" by the Supreme Court at the time of Brewer's trial. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723.

Therefore, this Court will order an evidentiary hearing at which the Commonwealth must proffer race-neutral reasons for its peremptory strikes of the first four African-American venirepersons.[14] *See Turner*, 63 F.3d at 814 (remanding to district court to hold evidentiary hearing to elicit prosecutor's motives at time of voir dire). If a meaningful proffer or evidentiary hearing is not possible at this point due to the passage of time (the trial was held in 1989), petitioner's writ will be granted. *See Simmons v. Beyer*, 44 F.3d 1160, 1168–71 (3d Cir.) (where there was thirteen-year delay between trial and evidentiary hearings thus making reconstruction of *Batson* record futile, unrebutted prima facie case requires granting habeas petition and holding new trial), *cert. denied*, —— U.S. ——, 116 S.Ct. 271, 133 L.Ed.2d 192 (1995); *Harrison v. Ryan*, 909 F.2d 84, 87–88 (3d Cir.) (where government could not reconstruct race-neutral reasons from record at evidentiary hearing held six years after trial, habeas petitioner granted new trial), *cert. denied sub nom., Castille v. Harrison*, 498 U.S. 1003, 111 S.Ct. 568, 112 L.Ed.2d 574 (1990); *see also Purkett*, —— U.S. at —— ——, 115 S.Ct. at 1774–75 (Stevens & Breyer, JJ. dissenting) (where trial court wrongly fails to decide whether proffered race-neutral reason was adequate because it erred in holding that prima facie case was not established, appellate court should weigh sufficiency of race neutral reason if record is adequate).[15]

---

**13.** The same result would obtain under the pre-amendment jurisprudence. *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 11, 112 S.Ct. 1715, 1721, 118 L.Ed.2d 318 (1992) (holding that petitioner who fails to develop factual record at state level shall not have an evidentiary hearing on federal habeas review absent showing of cause and prejudice). Here, the failure to develop a factual record was not Petitioner's fault and the cause and prejudice standard would not apply. *Cf. Lawrence v. Armontrout*, 31 F.3d 662, 665–66 (8th Cir.1994) (noting that *Tamayo–Reyes* cause and prejudice standard not applicable where state court abruptly cuts off opportunity to develop factual record notwithstanding defendant's attempt to do so but deciding on other grounds),

*cert. denied*, —— U.S. ——, 115 S.Ct. 1124, 130 L.Ed.2d 1087 (1995).

**14.** Moreover, the Commonwealth did not argue the retroactivity question in its supplemental brief, and to that extent, any argument respecting the application of the amendments to Brewer's petition is waived.

**15.** In supplemental briefing to the Court, Brewer contends that the record cannot be reconstructed plausibly at this point. Because the Commonwealth has not addressed whether an evidentiary hearing would be fruitful, the Court will proceed further before granting Brewer's writ.

### 5. The Fifth Juror

█ Brewer also contends that the trial judge erred in accepting the prosecutor's race-neutral reason with respect to the fifth African–American struck from the jury. The Court here adopts the Magistrate Judge' recommendation. The trial judge accepted the Commonwealth's reason that the venireperson, who had children the same age approximately as Petitioner, might be biased in his favor. Under the clearly erroneous standard of review, this Court will not second-guess the trial judge's credibility determination on this point. *See Hernandez,* 500 U.S. at 369–70, 111 S.Ct. at 1871–72 (according great deference to trial court's judgment as to whether race-neutral reason proffered was credible).

### B. *Delayed Disclosure of Exculpatory Evidence*

Brewer contends that the government's failure to disclose in timely fashion the boyfriend's identity on request deprived him of the opportunity to counter the "boyfriend story" on rebuttal in violation of his constitutional right to a fair trial and due process of law. Accordingly, he claims that the Court's denial of his motion to dismiss, motion for mistrial, and motion for new trial were improperly denied under the Fourteenth Amendment to the Constitution.

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to the accused upon request violates due process when the evidence is material to guilt or to punishment." *Id.* at 87, 83 S.Ct. at 1196–97. Here, Brewer contends that the prosecution's failure to disclose to him the identity of the victim's boyfriend prior to trial violated *Brady.* He argues that the name of the boyfriend, Lopes, was material because it later led to blood testing that ruled Lopes out as the donor of the semen samples taken from the victim. This evidence, claims Brewer, had value as it would have undermined the Commonwealth's claim that Lopes was the semen donor. Rather, he believes this additional evidence would have caused the jury to infer that the victim's father was the semen donor.

The trial judge rejected this claim in her denial of Brewer's new trial motion on the grounds that Brewer never formally requested the boyfriend's name before trial, and even if he had properly framed a *Brady* request, this evidence was not materially exculpatory. Thus a new trial was unnecessary. The Magistrate Judge reached the same conclusion on different grounds. Finding the evidence to have been material and exculpatory, she refused to recommend relief because Brewer failed to request a continuance at trial to make full use of the new information once it became available on rebuttal.

The Supreme Court recently clarified the proper "materiality" standard to apply to a *Brady* claim. "Favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley,* —— U.S. ——, ——, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). A "reasonable probability" is shown when, considering all of the evidence including that which was suppressed, "the whole case [is put] in such a different light as to undermine confidence in the verdict." *Id.* —— U.S. at ——, 115 S.Ct. at 1565. This is not a "sufficiency of the evidence test" and the favorable evidence should be considered collectively rather than item-by-item. *Id.* at —— – ——, 115 S.Ct. at 1565–67.

█ Impeachment evidence is *Brady* material, *see Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). However, a strong showing by the defendant is required to meet the "materiality test" when the undisclosed evidence is merely impeaching:

> In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant to the crime ... or where the likely impact on the witness's credibility would have undermined a criti-

cal element of the prosecution's case.... In contrast, a new trial is generally not required when the testimony of the witness is corroborated by other testimony or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility is already shown to be questionable. *United States v. Payne,* 63 F.3d 1200, 1210 (2d Cir.1995) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996); *see also United States v. Sepulveda,* 15 F.3d 1216, 1218–19 (1st Cir.1993) (holding new trial not warranted when witness's compensation from government was not disclosed because witness's own trial testimony showed him to be of "dubious credibility" and suppressed information would have been "at most, additional impeaching evidence."), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *United States v. Stern,* 13 F.3d 489, 495 (1st Cir.1994) (suppression of grand jury testimony of government witness was "merely newly discovered impeaching evidence" that "could not conceivably have altered the outcome.").

The Magistrate Judge found the boyfriend's identity material because "[i]f petitioner had known the identity of the victim's boyfriend prior to trial, petitioner may have had the opportunity to locate him, have him tested, and present the results at trial.... [P]etitioner was precluded from offering into evidence test results indicating whether or not the victim's boyfriend was the source of the semen sample contained in the rape kit." Report at 15. "Due to the [prosecutor's] delayed disclosure of the name of the victim's boyfriend, petitioner may have been thwarted from fully developing this more effective trial strategy." *Id.* If presented at trial, this evidence would have impeached the victim by suggesting that she failed to tell the whole story about with whom she had sexual intercourse on or about the night of the rape. Further, it would have supported the defendant's theory that the alleged victim had a motive to lie to protect her father. Thus, the boyfriend's identity proved after trial to be both material and exculpatory because it led to further evidence ruling out the boyfriend as the semen donor.

However, there is no evidence the government knew that the boyfriend's identity was potentially exculpatory prior to trial. As Brewer was warned before trial, the Commonwealth elicited testimony from the victim to explain the presence of semen in her vagina independent of the rape. The government believed that the boyfriend was the semen donor, and that this evidence, in itself, was incriminatory rather than exculpatory. Only after trial, once the boyfriend had been located and had agreed to be tested, did the exculpatory character of the evidence (i.e., that the boyfriend also was not the semen donor) become known.

■ Given that neither the prosecutor nor Brewer knew of the exculpatory character of the evidence before trial, the mere identity of the boyfriend without more does not constitute *Brady* material that should have been disclosed. *Brady* only applies to exculpatory information in the government's possession before or during trial; "[t]he rule in *Brady* simply does not apply unless the prosecutor had knowledge of the exculpatory information." *United States v. Moore,* 25 F.3d 563, 569 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 341, 130 L.Ed.2d 297 (1994). "Moreover, 'prosecutors are not usually required to seek out information which is not in their possession.'" *Id.* (quoting *United States v. Romo,* 914 F.2d 889, 898 (7th Cir.1990), *cert. denied,* 498 U.S. 1122, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991)); *see also United States v. Sepulveda,* 15 F.3d 1161, 1179 (1st Cir.1993) ("[T]he rigors of *Brady* do not usually attach to material outside the [ ] government's control.").

"Because the meaning of 'exculpatory' for any particular claim of a *Brady* violation must be determined in relation to an identifiable issue in the case, it is necessarily implicit in the standard for determining *Brady* obligations that any determination as to whether the government had a *Brady* obligation of disclosure of information at any particular time depends on what was or reasonably should have been known to the appropriate government representative[s] *at that time.*" *United States v. LaRouche Campaign,* 695 F.Supp. 1290, 1296 (D.Mass.

1988) (Keeton, J.) (emphasis in original). At the time of trial, the prosecutor believed the identity of the boyfriend to be relevant to rebut Petitioner's evidence that the he was not the semen donor and therefore the father must be. Only further investigation and testing yielded exculpatory evidence; therefore, the failure to divulge the boyfriend's name before or earlier in the trial was not a *Brady* violation.

▪ The Court also concurs with the Magistrate Judge's recommendation that Brewer's failure to request a continuance to further investigate the boyfriend vitiated any *Brady* claim he might later make. "When the issue is one of delayed disclosure rather than of nondisclosure, [ ] the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." *United States v. Ingraldi,* 793 F.2d 408, 411–12 (1st Cir.1986). "In considering the prejudice to a defendant's case from delayed disclosure of evidence, we have held it 'incumbent upon a party faced with such a situation to ask explicitly that the court grant the time needed to regroup, or waive the point.'" *United States v. Osorio,* 929 F.2d 753, 758 (1st Cir.1991) (quoting *United States v. Diaz–Villafane,* 874 F.2d 43, 47 (1st Cir.), *cert. denied,* 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989)); *see also Sepulveda,* 15 F.3d at 1178 ("When discovery material makes a belated appearance, a criminal defendant must ordinarily seek a continuance if he intends to claim prejudice.").

Brewer's suggestion that he was prejudiced by the delayed disclosure of the boyfriend's identity is belied by the fact that he did not explicitly request a continuance from the trial court. Indeed, he never pressed his request for the boyfriend's identity orally or in writing after the first day of the Commonwealth's case-in-chief. Brewer was forewarned that the Commonwealth might elicit the testimony on rebuttal if semen evidence were introduced by Brewer and had ample opportunity to lodge a formal request for the boyfriend's name via written motion as required by court rule. Mass.R.Crim.P. 13 (requiring defense motions to be in writing).[16] Perhaps concerned that testing of the boyfriend would confirm B.'s rebuttal, defense counsel did not press for the boyfriend's identity. Brewer's counsel had ample warning that the boyfriend's identity would become relevant at trial, that the trial judge wanted the requests in writing and that he should have requested a continuance to prepare for any effect such evidence could have on his defense. Whether for strategic reasons or oversight, his failure to seek identity of the boyfriend in a timely way or a continuance is an additional ground for rejecting his *Brady* claim.

## IV. *CONCLUSION AND ORDER*

Based on the foregoing, the Court rejects the Magistrate Judge's Report and Recommendation with respect to Brewer's *Batson* claim and adopts, in part, her recommendation regarding his *Brady* claim. The Court **ORDERS** the government to inform the Court by September 6, 1996, in writing whether it seeks an evidentiary hearing in order to meet its burden of producing a race neutral explanation for the peremptory challenges. If not, it should propose an order for habeas relief which will enable it to preserve any appellate rights.

The Court also adopts the report and recommendation (dated November 20, 1995) that the petition not be dismissed for failure to exhaust state court remedies.

---

**16.** A strong argument could be made that once Petitioner won his motion to admit the semen testing pursuant to the Rape Shield Act, and the *government* said it would introduce the evidence of the prior sexual acts with B.'s boyfriend, the identity of the boyfriend was no longer shielded from discovery. However, it did not then become *Brady* material subject to disclosure without request.